IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | | |
|---|---|---|
| **DOLLIE AYERS-JENNINGS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-2593-STA |
| | ) | |
| **FREDS, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

_____

**ORDER GRANTING DEFENDANT FREDS, INC.'S MOTION FOR SUMMARY JUDGMENT**
_____

Before the Court is Defendant Freds, Inc.'s Motion for Summary Judgment (D.E. # 24) filed on July 1, 2010. Plaintiff has responded in opposition to the Defendant's Motion. For the reasons set forth below, the Motion is **GRANTED**.

## BACKGROUND

The following facts are not in dispute for purposes of this Motion unless otherwise noted. Plaintiff was a long term employee with Fred's. (Def.'s Statement of Undisputed Facts ¶ 1.) At the time Plaintiff voluntarily resigned, she was a Location Clerk in the warehouse. (*Id*. ¶ 2.) Plaintiff disputes that she voluntarily resigned but rather states that she was forced to resign. Fred's is divided into two (2) distinct sides – one for the corporate employees and the other for warehouse employees. (*Id*. ¶ 3.)[1] Fred's has a Non-Fraternization policy, policy

---

[1] Plaintiff has disputed this statement of fact by arguing that there is no evidence that corporate employees and warehouse employees work for two distinct entities. The Court finds that while Plaintiff's characterization may be true, it is not responsive to Defendant's assertion

1

number 600.11, that prohibits managers and employees from dating if the manager may supervise the employee. (*Id*. ¶ 4.) This policy is part of Fred's General Policies. (*Id*.) Fred's also has a Company Standards/Conduct Policy that lists reasons for possible termination and includes "management personnel dating individuals whom they supervise." (*Id*. ¶ 5.) Plaintiff signed the Company Standards/Conduct Policy on April 28, 2005, indicating and affirming that she read and understood Fred's conduct policy. (*Id*. ¶ 6.)

On or about October 2006, Plaintiff began dating Willie Jennings ("Jennings"), a manager in the warehouse. (*Id*. ¶ 7.) They married in July 2007. (*Id*.) There are approximately 10 managers in the warehouse. (*Id*. ¶ 8.) Each warehouse manager has an obligation and duty to manage every employee in the warehouse, regardless of whether the employee directly reports to that specific manager. (*Id*. ¶ 9.) Plaintiff only admits that area managers are primarily responsible for the employees directly under their supervision in their respective areas. Given the nature of duties and assignments in the warehouse, Plaintiff was, from time to time, subject to the management of Jennings. (*Id*. ¶ 10.) Plaintiff disputes this statement. Both Plaintiff and Jennings violated Defendant's policies by dating and getting married while Jennings was a warehouse manager and Plaintiff was an hourly employee in the warehouse. (*Id*. ¶ 11.) Plaintiff disputes this statement asserting that Jennings was not her direct supervisor and made no supervisory decisions over her.

Defendant attempted to secure Plaintiff a job in the corporate office, but there were no

---

that Fred's employees are "divided into two distinct sides." Plaintiff adds that both corporate and warehouse employees were governed by the same policies at issue. Again while this statement appears to be true (Defendant admits as much in its Statement of Fact ¶ 4), it has no bearing on whether Fred's employees are "divided into two distinct sides."

available positions within her job skills. (*Id.* ¶ 12.) Plaintiff adds that Defendant made only a brief attempt to locate an alternate position for her. Defendant gave Plaintiff and Jennings the choice of which person would resign his/her position. (*Id.* ¶ 13.) Plaintiff chose to voluntarily resign her position with the company. (*Id.* ¶ 14.) Plaintiff argues that Defendant constructively forced her resignation as she earned far less than her husband.

Plaintiff has presented the following additional material facts in her response brief.[2] Defendant hired Plaintiff, an African American, on December 15, 1979. She eventually was transferred to Defendant's Distribution Center in Memphis, Tennessee ("DC") as an order picker. While Plaintiff worked at a few different positions and areas at the DC, she spent about the last ten years of her employment as a strategy clerk on the floor near the office area. Plaintiff's direct supervisor for the relevant time period was Mark Curtis ("Curtis"), and Curtis found Plaintiff to be a very good employee. When Curtis was absent, Plaintiff almost always dealt with Keith Jones ("Jones"), the receiving manager, and not another general area manager.

In October 2006, Plaintiff started to date Jennings, who was at the time an area manager in the DC. Prior to working at the DC, Jennings had been an area manager at another of Defendant's warehouses in Memphis. Jennings was not and had never been Plaintiff's direct supervisor. As his relationship with Plaintiff progressed, Jennings informed Jones, who was one

---

[2] Defendant objects that Plaintiff has failed to serially number her additional statements of facts and thereby prevented Defendant from responding to each statement separately. The Court notes that Plaintiff has cited to the record for each of her additional statements, which appears to have been adequate to permit Defendant to respond to her statements. The Court is including here only those statements of fact relevant to Plaintiff's claim for discrimination on the basis of her race.

his supervisors, about the relationship.  In fact, Jennings invited Jones to the wedding.  Jennings also informed Curtis, Plaintiff's direct supervisor, about the relationship sometime in March 2007.  Plaintiff and Jennings were married on July 21, 2007.  Plaintiff was never told that she could lose her job if she married Jennings.

Plaintiff took leave for the honeymoon and came back to work on Monday, July 30, 2007. When Plaintiff arrived at the DC, she and Jennings were summoned to a meeting with Reggie Jacobs ("Jacobs"), Defendant's Senior Vice-President of Distribution and Transportation.  Jacobs told Plaintiff and Jennings that they had until either that evening or Tuesday morning to make a decision on which one of them would resign or be terminated.  Jacobs informed Plaintiff that "under no circumstances would she and her husband be allowed to work for Fred's."

On July 30 or 31, 2007, Jacobs and Jamie Naughton ("Naughton"), Defendant's Vice-President of Corporate Human Resources, decided to terminate either Plaintiff or Jennings, and on the morning of July 31, Defendant terminated Plaintiff.  There is evidence in the record that Naughton inquired about possible openings in Defendant's corporate offices where Plaintiff might be qualified for placement. (Naughton Depo. 14:11-15:23.)  Naughton testified that there was no discussion of moving Jennings to another position.  (*Id*. at 40:12-18.)  Plaintiff's separation notice indicated that she was terminated due to a conflict with company policy.

In its Motion for Summary Judgment, Defendant argues that Plaintiff has failed to adduce evidence to make out her prima facie case of race discrimination.  Specifically, Defendant contends that Plaintiff cannot show that she was qualified for her position or that similarly situated employees who were not in her protected class were treated more favorably than she was.  According to Defendant, Plaintiff was subject to termination at the time she entered into a

4

dating relationship with Jennings. Furthermore, none of the comparator employees on which Plaintiff relies worked in the warehouse or worked in the same departments with each other or presented a risk of one spouse supervising the other spouse. Even if Plaintiff could carry her initial burden to make out a prima facie case, Plaintiff cannot show that Defendant's proffered reason for her termination is pretext for unlawful discrimination. Therefore, Defendant asserts that it is entitled to summary judgment on Plaintiff's race discrimination claim.

      In response, Plaintiff argues that she has adduced evidence to make out her prima facie claim and that Defendant's proffered reason for her termination is pretextual. As an initial matter, Plaintiff appears to suggest that she was not actually in violation of any company policy just by dating Jennings. According to Plaintiff, she had a previous long-term relationship with a co-worker named Ben Abrams who also worked in the DC and was eventually promoted to area manager, the same position Jennings held. As for her relationship with Jennings, Plaintiff states that Jennings had never had occasion to supervise her directly or make any decisions about the terms of her employment. Plaintiff next argues that she can present evidence that Defendant was willing to accommodate other non-protected employees who entered into romantic relationships. Plaintiff cites examples of employees working in Defendant's corporate division who were subject to the same policies about employees dating and marrying and yet were not forced to resign their positions with Defendant. Based on these comparators, Plaintiff maintains that she can make out a prima facie case for race discrimination. Plaintiff goes on to argue that she can demonstrate the pretextual nature of Defendant's proffered reason for her termination. Plaintiff argues that some employees of Defendant have testified that Plaintiff did not violate Defendant's policies. Naughton had the discretion as the human resources decision-maker not to terminate

5

Plaintiff.  The policy on its face explicitly stated that employees who married need not be terminated.  Plaintiff argues that Defendant's attempts to locate another position for her were cursory.  Plaintiff has also suggested that warehouse employees were held to a different standard than corporate employees because about 90% of warehouse employees were black whereas 90% of corporate employees were white.  Therefore, Plaintiff contends that Defendant is not entitled to summary judgment.

In its reply, Defendant argues that Plaintiff's comparator employees are not similarly situated.  None of the comparators were ever going to be in a position where their spouses or significant other would supervise them in the workplace.  Defendant emphasizes the different nature of the work in the warehouse where employees could be expected to work in several different areas and consequently find themselves supervised by different managers.

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(c) provides that a

> judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.[3]

In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[4]  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must

---

[3] Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[4] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

present some "specific facts showing that there is a genuine issue for trial."[5] It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[6] These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[7] When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[8]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[9] In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[10] Finally, the "judge may not make credibility determinations or weigh the evidence."[11] Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[12]

---

[5] *Celotex*, 477 U.S. at 324.

[6] *Matsushita*, 475 U.S. at 586.

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[8] *Id.* at 251-52 (1989).

[9] *Celotex*, 477 U.S. at 322.

[10] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[11] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[12] Fed. R. Civ. P. 56(c); *see also Celotex*, 477 U.S. at 322 (1986).

## ANALYSIS

Title VII makes it an unlawful employment practice "to. . . discharge any individual . . . because of such individual's race [or] color. . . ."[13] Where as here a plaintiff offers only circumstantial evidence of unlawful discrimination, the Court analyzes the case using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[14] Plaintiff bears the initial burden to establish her prima facie case of discrimination by showing that (1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) she was either replaced by a person outside of the protected class or was treated differently than similarly situated non-protected employees.[15]

The Court holds that Plaintiff cannot prove all of the elements of her prima facie case and accordingly Defendant is entitled to summary judgment on Plaintiff's claim of race discrimination. In the case at bar, the parties do not dispute that Plaintiff is a member of a protected group, that is, she is an African-American. While the parties differ over whether Plaintiff voluntarily resigned or was terminated, the Court finds that Plaintiff was effectively forced to resign her position with Defendant. It cannot be disputed then that Plaintiff suffered an adverse employment decision. The parties further dispute whether Plaintiff was qualified for her position. Defendant contends that Plaintiff was subject to termination at any time after she began dating a manager at the DC in violation of company policy. The record shows that

---

[13] 42 U.S.C. § 2000e-2(a)(1).

[14] *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

[15] *Russell v. Univ. of Toledo,* 537 F.3d 596, 604 (6th Cir. 2008).

Defendant maintained a "non-fraternization" policy, General Policy No. 600.11, which states in relevant part, "Single management employees are not to date anyone that they may directly or indirectly supervise."[16] The Court finds that this prohibition on dating is addressed to single management employees and not to employees generally. In fact, the policy goes on to state, "Because of the possible distractions at work, single employees are discouraged, but not prohibited, from dating other single Fred's, Inc. employees."[17] Based on the language of the policy and taking the facts in the light most favorable to Plaintiff, the Court holds that Defendant is not entitled to summary judgment on the issue of whether Plaintiff was no longer qualified for her position just by dating Jennings. On the contrary, a reasonable juror could conclude that Plaintiff as a non-management employee did not violate the policy.

Nevertheless, the Court concludes that Plaintiff has failed to adduce any evidence as to the fourth element of her prima face case, that she was either replaced by a person outside of the protected class or was treated differently than similarly situated non-protected employees. In this case, the parties have focused on whether Plaintiff has adduced evidence of true comparator employees and not whether Plaintiff was replaced by a person outside of her protected class. Having found no evidence in the record about Plaintiff's replacement, the Court must consider whether Defendant treated other similarly situated non-protected employees differently. Two employees must be "similarly-situated" in all relevant aspects of their respective employment circumstances.[18] The comparison employee (1) must have dealt with the same supervisor, (2)

---

[16] Ex. D to Def.'s Statement of Undisputed Facts.

[17] *Id*.

[18] *Ercegovich v. Goodyear Tire & Rubber*, 154 F.3d 344, 353 (6th Cir. 1998).

have been subject to the same standards, and (3) have engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."[19] These factors generally are all relevant considerations in cases alleging differential disciplinary action.[20]

The specific standard at issue in this case is Defendant's separate policy addressed to employees who marry another Fred's employee. In order to show that another Fred's employee was similarly situated to her, Plaintiff must show that the comparator employee was subject to the same policy on marriage and engaged in the same conduct as Plaintiff. Furthermore, Plaintiff must show that Defendant applied this policy to the comparator employee differently. Defendant maintained a general policy on the employment of family members or friends of current Fred's employees, and this policy addressed in relevant part the company's position when current employees married each other. According to policy 100.13, "Should any two employees marry each other after working for the Company while single, there is no requirement under this policy that one of them resign. However, Items # 4 and # 5 would be in effect."[21] Item # 4 states, "No relative shall work in the same department except as approved in advance by the Vice-President of Personnel."[22] Item # 5 states, "One relative is not placed under the supervision of another."[23] It is clear from company policy that although Plaintiff would not be required to resign by

---

[19] *Id*. at 352.

[20] *Id*.

[21] Policy on Employment of Relatives/Friends of Employees, 100.13, ex. I to Pl.'s Resp.

[22] *Id*.

[23] *Id*.

10

marrying Jennings, she could not work in the same department as Jennings without prior approval or be under his supervision. The record shows that Plaintiff and Jennings were given the ultimatum to resign because Defendant determined that both employees would be in violation of this policy.[24] The record also shows that Defendant made an attempt to find a new position within the company for Plaintiff, but there were none to be found. The policy is silent as to the consequences when an alternative position is not available. While Defendant did not automatically terminate a marrying employee, Defendant did not guarantee a marrying employee a transfer to a new position either. Therefore, Plaintiff must show that a similarly situated non-protected employee violated the same policy and yet was treated differently, that is, was allowed to keep his or her current position or that Defendant undertook different efforts to transfer the comparator to a new position.

The Court holds that Plaintiff has failed to make this showing. Plaintiff has cited three examples of similarly situated employees who married while they were Fred's employees but were treated differently than Plaintiff. The Court, however, finds that none of these comparators were similarly situated to Plaintiff in all relevant aspects of their employment. First, Jay and Angel Easterling were Defendant's employees who had dated and then married just as Plaintiff and Jennings had. Angel (then Daigle) was Jay Easterling's supervisor in the Import Department. However, the record shows that Jay Easterling applied for a transfer to become a

---

[24] Naughton Depo. 21:2-23. Plaintiff argues that Defendant's application of the policy had no basis in fact because Jennings had never been her direct supervisor. The Court notes that Plaintiff's argument goes to whether Defendant's application of the policy was pretextual and is therefore addressed to the third stage of the burden shifting analysis. At this stage, it is Plaintiff's burden to show that Defendant applied the same policy differently to other non-protected employees under the same circumstances.

staff accountant in another department and then approached management about dating his supervisor prior to beginning the relationship with Angel Daigle.[25] Easterling also requested that his transfer to the other department be expedited so that his relationship with Angel Daigle could proceed.[26] The Court finds the circumstances surrounding the Easterlings' relationship markedly different from those in Plaintiff's relationship with Jennings. There is no evidence that Plaintiff or Jennings ever approached management about their desire to begin dating or in any way attempted to comply with company policy about employee dating or marriage. There is no proof that Plaintiff or Jennings ever initiated a process to transfer to other positions to avoid working in the same department. It is undisputed that Plaintiff was familiar with Defendant's policy about managers dating employees and married employees working in the same department or in supervisory roles over the other spouse. Based on these differences alone, the Court holds that Plaintiff was not similarly situated to either of the Easterlings.

Plaintiff's second comparator couple is Ralph and Lenora Hickman. The only evidence Plaintiff has adduced is that these two employees dated and married after their employment with Defendant began. Plaintiff states that Ralph Hickman worked as a merchant for Defendant and that Lenora Hickman worked at some point as the director of the DC. Plaintiff has presented no proof that the Hickmans worked in the same department or that one of them was ever in a

---

[25] Naughton Depo. 46:24-50:20; Easterling Statement, ex. J to Pl.'s Resp. Plaintiff questions whether Jay Easterling actually approached management before he began dating his supervisor. Plaintiff has not adduced any evidence to support this inference other than the fact that the couple dated for about six months before marrying. Plaintiff simply assumes that because they married within a few months, their courtship must have begun much earlier. The Court finds this argument unavailing.

[26] Easterling Statement, ex. J to Pl.'s Resp.

supervisory position over the other.  Otherwise, there is no indication that the Hickmans were anything other than single Fred's employees who were "discouraged, but not prohibited, from dating other single" employees.  Therefore, Plaintiff has failed to show that the Hickmans were similarly situated to her.

Finally, Plaintiff has cited Reggie and Leigh Ann Jacobs as similarly situated Fred's employees who were treated differently.  As with the Hickmans, Plaintiff has only shown that the Jacobs were married and that both worked for Defendant for some period of time.  There is no evidence that the Jacobs worked in the same department: during the relevant time period, Reggie Jacobs was senior vice-president of distribution and transportation and Leigh Ann Jacobs worked in Defendant's real estate division.  In fact, based on the record before the Court, it is not even clear that the Jacobs had dated or married while they were Defendant's employees.[27] Therefore, Plaintiff has failed to show that either of the Jacobs were similarly situated to her.

For these reasons Plaintiff cannot make out her prima facie case of race discrimination. Because the Court holds that Plaintiff has failed to meet her initial burden, the Court need not determine whether Defendant has offered a legitimate, nondiscriminatory reason for Plaintiff's termination or whether that reason was pretextual.

---

[27] Reggie Jacobs Depo. 34:12-36:23, 57:15-58:6.

13

## **CONCLUSION**

Based on Plaintiff's failure to establish that similarly situated non-protected employees were treated differently, the Court holds that Plaintiff cannot make out her prima facie case of race discrimination.  Therefore, Defendant's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

        **s/ S. Thomas Anderson**
        S. THOMAS ANDERSON
        UNITED STATES DISTRICT JUDGE

        Date: September 21st, 2010.